## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| THEODORE M. PIZANIS, Individually and on Behalf of All Others Similarly Situated,<br><br>                                            Plaintiff,<br><br>v.<br><br>FURNITURE BRANDS INTERNATIONAL, INC., RALPH P. SCOZZAFAVA, and VANCE C. JOHNSTON<br><br>                                            Defendants. | Civil Action No.: 13-1703<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

By and through his undersigned counsel, Plaintiff alleges the following against Furniture Brands International, Inc. ("FBN" or the "Company") and certain of the Company's executive officers and beneficial owners (the "Individual Defendants"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by FBN and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on FBN's website concerning the Company's public statements; and (d) review of other publicly available information concerning FBN and the Individual Defendants.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action against FBN and certain of its officers for violations of the federal securities laws. Plaintiff brings this action on behalf of all persons or

entities who purchased or otherwise acquired shares of FBN common stock between February 13, 2013 and August 5, 2013, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The Exchange Act claims allege that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price. As a result of the fraud described below, the Company has lost a substantial portion of its market capitalization.

2.      Defendant FBN maintains principal executive offices in St. Louis, Missouri. FBN manufactures and distributes residential furniture. The Company's products include stationary upholstery products, occasional furniture, recliners and sleep sofas. The Company's trade names include, among others, Thomasville, Broyhill, Lane, and Drexel Heritage. The Company utilizes trademarks and trade names extensively to promote brand loyalty among consumers and views such trademarks and trade names as valuable assets that it aggressively protects. FBN carries its trade names on its books as assets, which are tested annually for impairment by comparing the carrying value and fair value of each trade name to determine the amount, if any, of impairment.

3.      Plaintiff alleges that Defendants have fraudulently inflated FBN's stock price during the Class Period by disseminating materially false and misleading statements, and failing to disclose material information known or recklessly disregarded by Defendants, concerning the Company's true financial condition, operation and business prospects.

4.      Specifically, throughout the Class Period, Defendants made false and misleading statements and/or failed to disclose that: (a) the Company was experiencing weaknesses in its wholesale business; (b) the Company's trade names were being carried at inflated values that would require material impairments; (c) the Company was experiencing severe liquidity issues; (d) and based upon the above, the Defendants lacked a reasonable basis for their positive

statements about the Company during the Class Period.

5.      As a result of Defendants' wrongful acts, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b 5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts and conduct complained of herein, including the preparation and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District.

9.      In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

**A.      Plaintiff**

10.      Plaintiff Keith Carter, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded FBN securities at artificially inflated prices during the Class Period and has been damaged thereby. (See Exhibit A).

B.      **Defendants**

i.       **The Company**

11.     Defendant FBN is a furniture company incorporated under the laws of the state of Delaware with headquarters in St. Louis, Missouri. During the Class Period, FBN maintained executive offices in St. Louis at 1 North Brentwood Boulevard, St. Louis, Missouri 63105. The aggregate number of FBN securities outstanding as of March 8, 2013 was approximately 56.3 million shares. FBN common stock is listed on the New York Stock Exchange ("NYSE") stock market under the ticker "FBN."

ii.      **The Individual Defendants**

12.     Defendant Ralph P. Scozzafava ("Scozzafava") has served as the Chief Executive Officer ("CEO") and Chairman of the Board of FBN throughout the Class Period. Scozzafava signed the Company's SEC filing on Form 10-K, certified the Company's SEC filings and participated in conference calls with analysts and investors during the Class Period.

13.     Defendant Vance C. Johnson ("Johnston") has served as the Senior Vice President and Chief Financial Officer ("CFO") of FBN throughout the Class Period. Johnston signed and certified the Company's SEC filings and participated in conference calls with analysts and investors during the Class Period.

14.     Defendants Scozzafava and Johnston are collectively referred to as the "Individual Defendants."

15.     The Company and the Individual Defendants are collectively referred to herein as the "Defendants."

16.     During the Class Period, the Individual Defendants, as senior executive officers of FBN, were privy to confidential, proprietary and material adverse non-public information concerning FBN, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of FBN's business.

18.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through such analysts, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

19.     As senior executive officers and/or directors and as controlling persons of a publicly traded Company, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to FBN's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of FBN's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of FBN's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## SUBSTANTIVE ALLEGATIONS

### A.     Background of FBN

21.     FBN manufactures and distributes residential furniture. The Company's products include stationary upholstery products, occasional furniture, recliners and sleep sofas. The Company's trade names include, among others, Thomasville, Broyhill, Lane, and Drexel Heritage. The Company utilizes trademarks and trade names extensively to promote brand loyalty among consumers and views such trademarks and trade names as valuable assets that it aggressively protects. FBN carries its trade names on its books as assets, which are tested annually for impairment by comparing the carrying value and fair value of each trade name to determine the amount, if any, of impairment.

22.     In describing the negative impact that an impairment charge to the Company's trade names would have on FBN's financial condition, the Company stated the following in its

most recent Form 10-K filed with the SEC on March 6, 2013:

> Impairment of our trade name intangible assets would result in a decrease in our earnings and net worth. Our trade names are tested for impairment annually or whenever events or changes in business circumstances indicate the carrying value of the assets may not be recoverable. Trade names are tested by comparing the carrying value and fair value of each trade name to determine the amount, if any, of impairment. The fair value of our trade names is estimated using a "relief from royalty payments" methodology, which is highly contingent upon assumed sales trends and projections, royalty rates, and a discount rate. Lower sales trends, decreases in projected net sales, decreases in royalty rates, or increases in the discount rate would cause impairment charges and a corresponding reduction in our earnings and net worth....

### B.   Defendants' Scheme to Artificially Inflate the Company's Stock and Insider Selling

23.     Defendants' devised a scheme to inflate the Company's stock price through a series of false and misleading statements regarding (a) the Company experiencing weaknesses in its wholesale business; (b) the Company's trade names being carried at inflated values that would require material impairments; and (c) the Company experiencing severe liquidity issues which in turn led to Defendants' presenting a misleading picture of FBN's financial condition, operation and business prospects.

24.     Despite Defendants' knowledge that the Company was financially performing poorly, prior to the Company disclosing this information to the investing public at the end of the Class Period, the Company's board increased FBN's CEO's, Defendant Scozzafava salary. On August 4, 2013, two days before the truth about the FBN emerged, the *Winston-Salem Journal* published an article titled, "Furniture Brands' decline accelerating" wherein the article stated the following with regard to Defendant Scozzafava's salary increase:

> Greenberg [analyst with TheStreet.com] decried ***the board's willingness to raise management compensation despite the revenue and share price plunges. For instance, the company reported in March the board extended Scozzafava's contract to April 2016, raising his annual salary by $50,000 to $800,000 during the period.***

25.     The same August 4, 2013 article additionally discussed that FBN's largest shareholder, Samson Holding Ltd., holding a 12.8% interest in the Company sold 267,768 shares of FBN stock. The article stated in pertinent part as follows:

> Samuel "Sammy" Kuo and his wife, Grace Liu, said in a recent regulatory filing **they are in the process of selling 267,768 shares of Furniture Brands stock from their Samson Holding Ltd. company.**
>
> Once that sell-off is complete, Samson's ownership will drop from 12.8 percent to less than 10 percent, or from 1.03 million shares to 763,856. Samson had owned a 44-percent higher stake in the company than the next largest shareholder, Royce & Associates LLC.
>
> The **couple's decision to sell 26 percent of their Furniture Brands holdings is stunning in itself since Samson acquired a 14.9 percent stake in October 2007** after the company rebuffed its plan for a possible "business combination" in July 2007.
>
> * * *
>
> **The reason Samson didn't buy a higher stake in 2007 was Furniture Brands' "poison-pill" affected any stakeholder owning at least 15 percent of its stock.** Shareholders typically are given the chance to buy additional or new shares at bargain prices, thus diluting the potential acquirer's stake.
>
> * * *
>
> Analysts say the couple's sell-off decision is another reflection of **how poorly Furniture Brands' management**, **led by chairman and chief executive Ralph Scozzafava, has performed the past six years.**
>
> * * *
>
> Gregg Greenberg, an analyst with _TheStreet.com_, included Furniture Brands in his list of "**The five dumbest things on Wall Street" for the week that ended July 26.**

### C.     Underline Misleading Statements

C.     **False and Misleading Statements**

26.     In regular press releases, conference calls and filings with the SEC, FBN and the Individual Defendants repeatedly made false and misleading statements and/or failed to disclose material adverse facts concerning the state and expectation of FBN's growth, operations, business prospects and finances, all of which raise significant concerns about the Company's

future stability and have caused the stock price to steadily decline.

27.     On February 13, 2013, FBN issued a press release reporting the Company's financial and operating results for the fourth quarter and full year ending December 29, 2012. The press release stated in pertinent part as follows:

ST. LOUIS, Feb. 13, 2013 (GLOBE NEWSWIRE) -- Furniture Brands International (NYSE:FBN) today announced financial results for the fourth quarter and full year ended December 29, 2012.

* Net sales of $264.0 million, an increase of 3.3% as compared to the fourth quarter of 2011

* Gross margin of 20.7% as compared to 23.0% in the fourth quarter of 2011

* SG&A of $70.9 million as compared to $71.8 million in the fourth quarter of 2011

Mr. Ralph Scozzafava, Chairman and CEO stated, "Fourth quarter sales increased 3%, however much work remains to be done in order to make progress driving profitable sales growth. In 2012 we ramped up production in our Mexico and Indonesia facilities and started our Broyhill casegoods mixing program, all of which will enable us to reduce our costs and participate more in the high-volume, lower-price point segments of the market. We also increased our mix of transitional and updated product to broaden our style appeal, and we improved service to our dealers with our Broyhill casegoods mixing program and Lane and Broyhill quickship programs."

Mr. Scozzafava added, "Looking forward, our focus in 2013 continues to be on generating free cash flow, and to that end we will intensify our efforts to drive profitable sales growth through product, pricing and dealer service initiatives. We will also remain focused on manufacturing efficiencies as well as on reducing costs and improving working capital."

* * *

The Company had an operating loss of $23.9 million as compared to an operating loss of $10.2 million in the prior year quarter. The current quarter operating loss includes $11.3 million of charges, which consist of the aforementioned $3.8 million of cost reduction charges as well as $7.5 of impairment charges, comprised of $6.1 million related to assets held for sale and $1.4 million related to trade names. The prior year operating loss includes a $3.0 million gain on idle facility sales partially offset by $0.2 million in impairment related to assets held for sale, both of which are recorded in Impairments of assets, net of recoveries.

Interest expense was $2.3 million as compared to $1.0 million in the prior year period. The increase in interest expense was primarily due to the increased interest rate on higher debt and closing cost amortization related to the previously announced debt refinancing in September 2012.

Net loss for the fourth quarter of 2012 was $22.9 million, or $0.41 per diluted share, which includes a $10.8 million after-tax charge from the aforementioned items, partially offset by the reversal of a $2.4 million valuation allowance on our tax assets, which was recorded in Income tax benefit. This compares to a net loss of $9.5 million, or $0.17 per diluted share, in the fourth quarter of 2011, which includes a $2.8 million after-tax gain from the aforementioned items.

* * *

The Company ended the year with a cash balance of $11.9 million and a debt balance of $105.0 million.

Outlook for 2013:

| Item | 2012 Actual | 2013 Estimate |
|---|---|---|
| Capital Expenditures | $7.6 million | $18 to $21 million |
| Depreciation and Amortization | $18.9 million | $17 to $19 million |
| Pension Contribution | $8.4 million | $6 to $6.5 million |

28.     On March 6, 2013, the Company filed its annual report for the period ended December 29, 2012 on Form 10-K with the SEC, that was signed by Defendant Scozzafava, and repeated the Company's previously announced financial results. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Scozzafava and Johnston, stating that the financial information contained in the Form 10-K was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

29.     On May 3, 2013, the Company issued a press release reporting its financial results for first quarter ended March 30, 2013. The press release stated in pertinent part as follows:

ST. LOUIS, May 3, 2013 (GLOBE NEWSWIRE) -- Furniture Brands International (NYSE:FBN) today announced financial results for the quarter ended March 30, 2013.

For the quarter ended March 30, 2013:

* Net sales were $254.7 million compared to $287.3 million for the three months ended March 31, 2012, a decrease of $32.6 million, or 11.3%. First quarter 2013 retail sales at the 49 Thomasville company-owned stores totaled $26.9 million compared with sales of $27.5 million at 48 Thomasville company-owned stores in the prior year period. First quarter same-store sales at the 46 Thomasville stores that the company has owned for more than 15 months were down 2.3% compared to the first quarter of 2012, when same-store sales were flat.

* Gross profit was $51.5 million and gross margin was 20.2%, which included $1.0 million in charges related to product rationalization. Gross profit for the first quarter of 2012 was $71.4 million and gross margin was 24.9%. Excluding this charge, the decrease in first quarter 2013 gross margin when compared to the year ago period was primarily due to deleveraging of fixed manufacturing costs due to lower sales, product rework and additional inventory charges, increased freight costs, and increased employee benefit costs.

* Selling, general and administrative expenses (SG&A) for the first quarter of 2013 totaled $69.1 million and included $0.5 million in charges related to dark stores. SG&A expenses for the first quarter of 2012 totaled $70.0 million. Excluding this charge, the decrease in the first quarter 2013 SG&A was primarily due to lower

compensation costs, partially offset by an increase in advertising expense.

* The Company had an operating loss of $19.0 million as compared to an operating income of $1.4 million in the prior year quarter. The current quarter operating loss includes $2.9 million of charges, which consist of the aforementioned $1.5 million of charges as well as $1.4 million of impairment charges related to assets held for sale.

* Interest expense was $2.4 million as compared to $0.8 million in the prior year period. The increase in interest expense was primarily due to the increased interest rate on higher debt and amortization of debt issuance costs related to the previously announced debt refinancing in September 2012.

* Net loss for the first quarter of 2013 was $21.2 million, or $0.38 per diluted share, which includes a $2.9 million after-tax charge from the aforementioned items. This compares to a net profit of $0.4 million, or $0.01 per diluted share, in the first quarter of 2012.

* The Company ended the quarter with a cash balance of $10.3 million and a debt balance of $116.8 million.

Mr. Ralph Scozzafava, Chairman and CEO stated, "While this was a difficult quarter in what was a volatile environment, we are aggressively addressing the issues. We are well underway on implementing our transformation plan to restore positive EBITDA and free cash flow generation. Most notably, we made significant progress in revamping our stationary line at Lane and introduced a new line of motion upholstery at Broyhill. In addition, the continued transition of our product line and marketing at Thomasville saw strong response as evidenced by a 6% increase in first quarter written sales in our Thomasville company-owned stores. We also made progress with our supply chain network efficiency program as we are currently consolidating our Mt. Airy facility into our Longview plant. Finally, we continued our overall cost containment efforts and have identified further opportunities for meaningful reductions."

30.      On the same day, the Company filed its quarterly report for the quarter ended March 30, 2013 on Form 10-Q with the SEC, that was signed by Defendant Johnston, and repeated the Company's previously financial results. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Johnston and Scozzafava, stating that the financial information contained in the Form 10-K was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

31.      The Company's aforementioned statements are false and misleading because Defendants misrepresented and failed to disclose adverse facts, which were known to Defendants or recklessly disregarded by them, including that (a) the Company was experiencing weaknesses in its wholesale business; (b) the Company's trade names were being carried at inflated values

that would require material impairments; (c) the Company was experiencing severe liquidity issues; (d) and based upon the above, the Defendants lacked a reasonable basis for their positive statements about the Company during the Class Period.

### D.    The Truth Comes To Light

32.    On August 6, 2013, prior to the open of the financial markets, the Company issued a press release, reporting the Company's second quarter financial results for the quarter ending June 29, 2013. The Company disclosed another material impairment and that it would need to address liquidity challenges and improve business performance by implementing strategic initiatives to achieve cost reductions, pursuing asset sales and working with its lenders to potentially modify its credit facilities. The Company's press release stated in pertinent part as follows:

ST. LOUIS, Aug. 6, 2013 (GLOBE NEWSWIRE) -- Furniture Brands International (NYSE:FBN) today announced financial results for the second quarter ended June 29, 2013. The Company also announced that in order to address its liquidity challenges and improve business performance it is implementing strategic initiatives to achieve cost reductions, pursuing asset sales and working with its lenders to potentially modify its credit facilities.

* Net sales for the second quarter of 2013 were $255.0 million, a decline of 4.0% compared to net sales of $265.5 million in the second quarter of 2012. Second quarter 2013 retail sales at the 49 Thomasville company-owned stores totaled $26.4 million compared with sales of $25.6 million at 48 company-owned stores in the prior year period. Second quarter same-store sales at the 44 Thomasville stores that the Company has owned for more than 15 months, were up 4.5% compared to the second quarter of 2012.

* Gross profit for the second quarter of 2013 was $46.6 million and gross margin was 18.3%, compared to $64.0 million in gross profit and 24.1% gross margin in the prior year period. Gross profit for the second quarter of 2013 includes $2.4 million in charges related to product rationalization. Excluding this charge, the decrease in second quarter 2013 gross margin was primarily due to deleveraging of fixed manufacturing costs due to lower sales as well as additional clearance of older inventory and product that is being replaced.

* Selling, general and administrative expenses for the second quarter of 2013 totaled $63.0 million as compared to $69.4 million in the second quarter of 2012. This decrease was primarily due to lower compensation costs, marketing expenses, and expenses resulting from cost reduction activities, partially offset by higher bad debt expense due to lower bad debt recoveries in the current quarter.

* The Company had an operating loss of $43.2 million in the second quarter of 2013 as compared to an operating loss of $5.8 million in the prior year period. *The operating loss in the second*

*quarter of 2013 includes $29.3 million of charges, which consist of the previously mentioned $2.4 million of product rationalization and $26.9 million of asset impairment charges.*

* The $26.9 million asset impairment charges includes $15.7 million related to an impairment of software assets as the Company is narrowing the scope of a planned systems implementation, $10.8 million related to trade name impairments, and $0.4 million of impairment charges related to assets held for sale.

* Interest expense was $2.5 million as compared to $0.8 million in the prior year period. The increase in interest expense was primarily due to the increased interest rate on higher debt and amortization of debt issuance costs related to the previously announced debt refinancing in September 2012.

* Net loss for the second quarter of 2013 was $40.8 million, or $5.15 per diluted share, which includes a $25.1 million after-tax charge from the aforementioned items. This compares to a net loss of $6.8 million, or $0.86 per diluted share, in the second quarter of 2012. These loss per share amounts are based on a share count that reflects the 7 for 1 reverse stock split that took place during the second quarter of 2013.

33.    33.    The Company ended the quarter with a cash balance of $8.8 million and a debt balance of $117.7 million. In the same press release, Defendant Scozzafava stated:

Our financial performance in the second quarter was below our expectations. Continued solid top and bottom line performance of our designer brands and improving sales and *order trends at our Thomasville owned retail stores were once again significantly over-shadowed by the challenges we are facing in stabilizing sales and profitability in our wholesale businesses."*

                                        ***

As a result of the challenges we continue to face, we are conducting a thorough strategic review of our business and have engaged outside advisors to assist us in this effort. *The scope of this effort encompasses achieving further cost reductions, pursuing asset sales and modifying our credit facilities in order to improve our liquidity.*

34.    On this news, the Company's shares declined $0.84 per share on August 6, 2013 to close at $1.37 per share, a one-day decline of 38% on heavy trading volume.

35.    As a result of Defendants' wrongful course of conduct, FBN shareholders have lost millions of dollars in their investment in the Company.

## UNDISCLOSED ADVERSE INFORMATION

36.    The market for FBN's securities was an open, well-developed and efficient market at all relevant times. As a result of the materially false and misleading statements and failures to disclose described herein, FBN's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired

FBN's securities relying upon the integrity of the market price of FBN's securities and market information related to FBN, and have been damaged thereby.

37.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of FBN's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

38.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about FBN's business, prospects and operations.

39.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of FBN and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## <u>NO SAFE HARBOR</u>

40.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those

projected." Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

41.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of FBN who knew that those statements were false when made.

## SCIENTER ALLEGATIONS

42.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

43.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding FBN, their control over, receipt and/or modification of FBN's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning FBN, participated in the fraudulent scheme alleged herein.

44.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## LOSS CAUSATION

45.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of FBN's securities and operated as a fraud or deceit on Class Period purchasers of FBN's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of FBN's securities fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of FBN's securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.* damages, under the federal securities law.

46.     By failing to disclose the true state of the Company's business prospects and operations, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of FBN's business and prospects. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused FBN to conceal the truth.

47.     Defendants' false and misleading statements caused FBN's common stock to trade at artificially inflated levels throughout the Class Period. However, as a direct result of the Company's problems coming to light, FBN's common stock price fell precipitously from its Class Period high. The stock price drop discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

48.     The decline in the price of FBN's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of FBN's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed

market conditions or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of FBN's securities and the subsequent decline in the value of FBN's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

<u>APPLICABILITY OF PRESUMPTION OF RELIANCE:</u>
<u>FRAUD ON THE MARKET DOCTRINE</u>

49.     At all relevant times, the market for FBN stock was an efficient market for the following reasons, among others:

a.     FBN securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b.     As a regulated issuer, FBN filed periodic public reports with the SEC and the NYSE;

c.     FBN securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d.     FBN regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

50.     As a result, the market for FBN securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in FBN's stock price. Under these circumstances, all purchasers of FBN securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## X. CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired FBN securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of FBN and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

52.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States. Throughout the Class Period, FBN securities were actively traded on the NYSE (an open and efficient market) under the symbol "FBN". As of February 22, 2013, FBN had approximately 56.3 million shares outstanding. Record owners and other members of the Class may be identified from records maintained by FBN and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

53.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

55.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

        b.     whether Defendants participated in and pursued the common course of conduct complained of herein;

        c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period

misrepresented material facts about the business, finances, financial condition and prospects of FBN;

        d.     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of FBN;

        e.     whether the market price of FBN common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

        f.     the extent to which the members of the Class have sustained damages and the proper measure of damages.

56.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a

class action.

## XI. COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

57.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

58.     During the Class Period, FBN and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of FBN common stock; and (iii) cause Plaintiff and other members of the Class to purchase FBN stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

59.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FBN securities in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of FBN, as alleged herein.

60.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative

statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

61.     FBN and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of FBN as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of FBN's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about FBN and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of FBN's securities during the Class Period.

62.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level

executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

63.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FBN's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of FBN securities was

artificially inflated during the Class Period. In ignorance of the fact that the market price of FBN shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired FBN securities during the Class Period at artificially inflated high prices and were damaged thereby.

65.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of FBN, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired FBN securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.     By virtue of the foregoing, FBN and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act Against the Individual Defendants

68.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against all the Individual Defendants.

69.     The Individual Defendants were and acted as controlling persons of FBN within

the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.     As set forth above, FBN and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)  Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)  Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)  Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)  Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:    August 30, 2013                    **CAREY, DANIS & LOWE**

By: */s/ James J. Rosemergy*
James J. Rosemergy
Carey, Danis & Lowe
8235 Forsyth Boulevard, Suite 1100
Saint Louis, Missouri 63105-1643
Telephone: 314-725-7700
Facsimile: 314-721-0905
Email: jrosemergy@careydanis.com

*Liaison Counsel for Plaintiff*

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**

Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016

Telephone: 212-661-1100
Facsimile:  212-661-8665